SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK,<br><br>               - against-<br><br>MARTIN BASKERVILLE,<br><br>             Defendant. | Index No. 7717/89<br><br>**Affirmation of Michael S. Kimm, Esq., in Support of Defendant's Motion to Vacate Judgment of Conviction** |

MICHAEL S. KIMM, ESQ., an attorney duly admitted to practice law before the Courts of the State of New York, affirms under penalty of perjury:

## INTRODUCTION

1. Retained in October 2017, I am the lead attorney representing defendant Martin Baskerville with respect to his post-conviction application to vacate the judgment of conviction filed on November 21, 1989. Although the New York sentence has been fully served, his New York case had a direct effect upon a contemporaneous conviction for armed robbery conviction in New Jersey, and the stigma of being convicted of homicide, which is lifelong, and thus Mr. Baskerville seeks to vindicate his name and reputation from that those unjust effects arising out of his false "conviction for homicide" based upon perjured testimony and lack of evidence.

2. The New York homicide for which Mr. Baskerville was convicted allegedly occurred on April 4, 1989. After perfunctory trial, after the defense counsel's abject failure to raise an alibi defense and after the People put forward perjured testimony, Mr. Baskerville

1

was convicted and the judgment of conviction of the Supreme Court of the State of New

York, New York County was entered under indictment 7717/89.  After being indicted, and

after being tried with false testimony, Mr. Baskerville received concurrent prison terms of

sixteen years to life on the first count, seven years to twenty-one years on the second count,

and five to fifteen years on the third count.   Based upon the evidence demonstrated below,

showing that Mr. Baskerville was incarcerated when the alleged homicide occurred, for

which he was convicted, Mr. Baskerville is entitled to the vacatur of his conviction.

### THE BERGEN COUNTY NJ SHERIFF'S DEPARTMENT'S REVELATION OF KEY FACT: BASKERVILLE'S *INCARCERATION* DURING THE ALLEGED NY HOMICIDE

3. During Mr. Baskerville's efforts to obtain jail credits while serving an unrelated

armed robbery sentence in New Jersey, in approximately 2006, he was provided with proof

from the Bergen County Sheriff's Office, custodian of the local jails, that Mr. Baskerville

had been incarcerated on certain dates, thus entitling him to jail credits on account of his

armed robbery conviction in New Jersey.  In an uncertified, unsworn letterhead of the Bergen

County Sheriff's Office, Lt. Stapleton wrote Mr. Baskerville's NJ attorney Ms. Haeger:

August 15, 2006

Dear Ms. Heeger,

As per your request I am providing you with the following
information for Mr. Martin Baskerville's incarceration at the
Bergen County Jail aocording to our records.

S-1350-87 - 09/06/87 - 09/19187
S-524-88 - 12/25/87 - 04/07/88

**02/28/89 -08/15/89**
02/18/93 -09/01/93
S-1144-88 - no jail time
FV-02-2410-984 - no jail time

If you have any questions, please call me at 201-527-3048

Sincerely,
Lieutenant James Stapleton

(Emphasis added) (Exhibit I, below).

4. Given that the alleged New York homicide occurred on April 4, 1989, that date would have fallen squarely between the underscored dates above, after his incarceration in Bergen County Jail on February 28, 1989, and his release from Bergen County Jail on August 15, 1989. It would have been an impossibility for him to be physically present in two places at the same time.

5. While he did not commit the NY homicide, Mr. Baskerville was an easy target of unscrupulous prosecution-witnesses that disregarded honesty boundaries, in order to assist law enforcement's convictions and to obtain credit for their own crimes. As will be demonstrated below, Mr. Baskerville never had a chance to clear his name in a timely manner because (1) his inept defense lawyer failed to interview Mr. Baskerville or to raise alibi and (2) the prosecution used perjured testimony from witnesses and later provided at least one of them, early parole support, without disclosing the apparent cooperation agreement.

6. The following facts are based on my review of the case, including (1) various transcripts; (2) documents obtained by the State of New Jersey Public Defender's office; (3)

3

various affidavits; (4) various jail and arrest records; (5) records obtained by defendant's prior counsel; (6) conversations with my client; and (7) my own investigation.

7. Mr. Baskerville has been wrongfully convicted of a murder which is said to have occurred on April 4, 1989 in New York County.   Relevant history begins with events involving Mr. Baskerville in New Jersey in 1988.

## THE EARLIER, NEW JERSEY ARRESTS

8. In a matter unrelated to the New York homicide of April 4, 1989, on April 11, 1988, Mr. Baskerville was indicted for assaulting an officer and resisting arrest. Exhibit A.

9. On September 23, 1988, bail was set at $15,000 by Judge Andrew Napolitano. Exhibit B.  Mr. Baskerville did not have the funds and thus he could not make bail.  That same date, he pleaded guilty to the simple assault and his jail term continued. While still in custody in New Jersey, Mr. Baskerville was re-arrested on, February 28, 1989, due to a violation of probation (VOP) allegation caused by the events that resulted in his September 23 guilty plea. The probation violation is listed as an unknown offense. See Sentencing Minutes marked as Exhibit C.

10. Also, annexed hereto as Exhibit D is a report from Office of the Bergen County Sheriff which shows the unknown charge re-arrest date of February 28, 1989.

11. Mr. Baskerville remained in custody of Bergen County Jail until he was re-arrested by New York City homicide detectives on August 15, 1989, for the murder/robbery of one Manuel Garcia. See Exhibit B.

4

12. A State of New York, Division of Criminal Justice Services document, shows the September 23, 1988 arrest date (page 60a) and August 15, 1989 re-arrest date (page 54a). Exhibit E. Given these facts, the murder/robbery occurred on April 4, 1989 while Mr. Baskerville was in the custody of Bergen County Jail.

13. Mr. Baskerville informed his counsel at the time that he was in jail during the April 4, 1989 murder of Manuel Garcia. Investigation into this alibi claim would have resolved any shadow of a doubt but Baskerville's trial counsel was ineffective as he failed to pursue the known alibi defense because of alleged issues with obtaining Mr. Baskerville's jail records from New Jersey.

14. Throughout the decades which followed Mr. Baskerville's arrest, Mr. Baskerville has been working as best as he could in obtaining any and all possible records in order to prove his innocence and show that he was in fact in custody on April 4, 1989.

## NEW YORK PROCEDURAL HISTORY

15. After a jury trial in New York Supreme Court, Mr. Baskerville was convicted of one count of murder in the second degree, one count of robbery in the first degree, and one count of robbery in the second degree, for the crimes that occurred on April 4, 1989 in Manhattan. Annexed hereto as Exhibit F is the trial transcript.

16. Mr. Baskerville received concurrent prison terms of sixteen years to life on the first count, seven years to twenty-one on the second count, and five to fifteen years on the third. Only after a relentless search lasting nearly decades for the missing jail records and as

a direct result of Mr. Baskerville's "due diligence and determination" was Mr. Baskerville able to obtain the evidence he was seeking. By a court order, dated November 4, 2015, Mr. Baskerville received jail credits for 1,693 days, which included the time period from February 20, 1989 to August 15, 1989. See Exhibit G.

17. Annexed hereto as Exhibit H is a change of judgment of conviction and order for commitment dated March 21, 2016 showing the amended jail credits.

18. Annexed hereto as Exhibit I is a letter dated August 15, 2006 from Lieutenant James Stapleton which further confirms that Mr. Baskerville was in custody during the April 4, 1989 murder.

19. Taking a step back, Mr. Baskerville's procedural history extends over 25 years as he served his New York sentence for a crime he possibly could not have committed. On October 27, 1989 the Mr. Baskerville was granted a Huntley hearing in order to suppress a statement made to police while his rights to counsel were violated. Annexed hereto as Exhibit J is a transcript from the Huntley hearing. Suppression of the statement was denied.

20. On March 18, 1998 Mr. Baskerville filed his petition for writ of Habeas Corpus in Southern District of New York under Docket No. 1:98-cv-1816-RCC. Habeas was denied; the denial was affirmed by the Second Circuit.

21. On September 24, 2007, Mr. Baskerville filed a Motion to Vacate conviction pursuant to CPL 440.10 (1)(g) and (1)(h); the motion was denied. Exhibit K.

22. Currently, Mr. Baskerville is filing a motion to vacate his conviction based on

"actual innocense" based on newly available proof of innocense that has been validated by the courts of the State of New Jersey.

23. Annexed hereto as <u>Exhibit L</u> is a transcript from sentencing hearing dated August 25, 1993. In contrast, annexed hereto as <u>Exhibit M</u> is a transcript from motion for jail credits hearing dated February 9, 2015. Annexed hereto as <u>Exhibit N</u> is a transcript from motion hearing dated May 4, 2015. Annexed hereto as <u>Exhibit O</u> is a transcript from motion hearing dated July 22, 2015. Annexed hereto as <u>Exhibit P</u> is a transcript from motion hearing dated September 28, 2015.

24. These 2015 hearing transcripts show that the New Jersey courts have come to recognize that Mr. Baskerville was indeed incarcerated in the past and entitled to numerous intervals of jail credit, totaling 1830 days., i.e., over 5 years of credit, which renders the New Jersey court process clearly defective.

## THE CONVERGENCE OF KEY EVENTS:
## (1) NEW YORK DEFENSE COUNSEL'S FAILURE TO RAISE ALIBI;
## (2) NEW YORK STATE'S USE OF FALSE FACTS; AND
## (3) NEW JERSEY STATE'S LOSS OF CRITICAL FACTS

25. As it later came to light, on April 4, 1989, Manuel Garcia and Hector Martinez were selling cocaine from an apartment at 1792 Amsterdam Avenue. Mr. Martinez was acting as the "doorman" when two males whom he did not know arrived at the apartment at about 8:15 or 8:30 p.m. The two men eventually shot both Mr. Garcia and Mr. Martinez, and took the cocaine that was in the apartment. Mr. Garcia did not survive the assault and Martinez was unable to identify either of his assailants. Tr. October 15, 1990, at 44 to 52.

Exhibit Q.

26. On November 11, 1989, Mr. Baskerville met with his assigned New York counsel for the first time and it was at this time that he was provided with a copy of the New York County Indictment 00717089 dated July 14, 1989. See Exhibit A. After reviewing the indictment, Mr. Baskerville immediately brought it to counsels attention that on the date the alleged murder, April 4, 1989, he was in the custody of the Bergen County Jail. Tr. February 9, 2015, at 5 to 18.

27. Thereafter, Mr. Baskerville provided counsel with the dates he was in the Bergen County Jail for verification of his alibi defense. However, upon speaking with counsel regarding his alibi defense, he was informed that the records department at the Bergen County Jail was unable to locate any of Mr. Baskerville's jail records, due to an alleged flood and misplacement of his records. Tr. May 4, 2015, at 6 to 22.

28. Mr. Baskerville informed counsel that the Bergen County Prosecutors Office was in the process of extraditing him back to New Jersey, as he had expressed his desire to accept the five year plea agreement offered by the Bergen County Prosecutor and to secure the jail credits that could establish that he was in the Bergen County Jail on April 4, 1989, when the New York homicide was to have occurred. Tr. May 4, 2015, at 6 to 8.

29. Once again, counsel reiterated that the Bergen County Records Department had stated that they had never heard of the Mr. Baskerville. It was also counsels position that if the Mr. Baskerville  intended to testify at trial that he was in the custody of the New Jersey

authorities when the alleged homicide supposedly occurred as an alibi defense without documentary proof, the jury would think that he was lying. Tr. February 9, 2015, at 5 to 6.

31. During this period, two Interstate Agreements of Detainer were filed after Mr. Baskerville was notified by the Bergen County Prosecutor's Office that they were in the process of extraditing him back to New Jersey for trial in October, 1989. However, he was not returned to New Jersey until 1993 for trial. Mr. Baskerville explained that he was extremely frustrated that the Detainers were not acted upon by New Jersey authorities. Tr. February 9, 2015, at 8 to 11.

30. On January 8, 1993, after more than six years from the date of arrest in 1987, Mr. Baskerville was finally returned to the State of New Jersey pursuant to an Interstate Agreement on Detainers for final disposition.

31. On June 22, 1993, Mr. Baskerville's New Jersey jury trial commenced and continued through July 1, 1993. Mr. Baskerville was found guilty and sentenced to a term of twenty years to run consecutive to his New York sentence of sixteen years to life.

32. On August 25, 1993, Mr. Baskerville appeared for sentencing and prior to being sentenced, he was asked by the court, if there were any objections to his Pre-sentence Report. In response, Mr. Baskerville objected to the jail credits. Tr. August 25, 1993 at 3.

33. Surprisingly, the sentencing judge conceded that there was an error with regard to jail credits owed and acknowledged that Mr. Baskerville did not have any co-defendants in the charged crime, but chose not to remove the false and misleading information from the

10

Pre-sentence Report which the court was aware would appear before the New Jersey Parole Board. Tr. August 25, 1993, at 3 to 18.

34 . Mr. Baskerville went to great lengths in an effort to obtain his Bergen County Jail Records to prove his innocence in the New York homicide. Over the years, the Bergen County Sheriff claimed that the records had been lost; of that the records have been damaged due to flooding; or that the records had been under the management of a private, outsourced entity; or other excuses. Mr. Baskerville ultimately secured pieces of the missing jail records after repeated efforts. See Tr. May 4, 2015, at 6-12.

35. In addition to the missing New Jersey jail records, Mr. Baskerville was further prejudiced by the failure of New Jersey to act on the Interstate Agreement on Detainers filed in 1989, 1990 and 1992, which would have returned him to New Jersey promptly.

36. Even after he obtained the records, New York would not accept Mr. Baskerville's documentation as official documents because they were not certified. See Tr. July 22, 2015, at 4 to 7.

37. In 2014, Mr. Baskerville filed a motion seeking additional jail credits in Bergen County Superior Court, and reconsideration of his sentence on several grounds. Mr. Baskerville submitted the Amended Judgment of Conviction dated November 28, 2011, Annexed hereto as Exhibit R, based on documentary proof he had submitted which established that defendant was actually in the Bergen County Jail on April 4, 1989 when the alleged New York homicide was to have occurred.

38. In his motion, Mr. Baskerville also submitted the uncertified letter from Lt. James Stapleton of the Office of the Bergen County Sheriff dated August 15, 2006 stating that defendant was incarcerated in the Bergen County Jail on several dates including February 28, 1989 through August 15, 1989. Another investigator named Sgt, Steven Ahrendt from the Bergen County Jail Records Department contradicted Lt. Stapleton's earlier letter and claimed that Mr. Baskerville was incarcerated in the Bergen County Jail from February 28, 1989 to June 28, 1989. The Ahrendt letter is annexed as Exhibit S.

39. No explanation has been provided for this diametrical contradiction but the New Jersey courts apparently validated the accuracy of the Stapleton letter and jail periods. Sara Gurwitch, supervising staff attorney of the Appellate Defender in New York called the Bergen County Jail and spoke with Sgt. Ahrendt who checked the Superior Court computer system and informed her that Mr. Baskerville was indeed incarcerated at the Bergen County Jail from February 28, 1989 through June 28, 1989. Yet he never fixed his written letter. No certified statement or letter has been provided by the Bergen County Sheriff to Mr. Baskerville. His prejudice continued.

40. Mr. Baskerville's trial attorney in 1989 advised the court that he was investigating whether Baskerville had been charged in New York with a direct homicide which would of been impossible for him to have committed since he was incarcerated in Bergen County Jail at the time. See Tr. February 9, 2015, at 4 to 6.

41. Mr. Baskerville's position was that the New Jersey courts should have re-

sentenced him to a concurrent sentence and to the presumptive term of fifteen years in the interest of justice.  If the New Jersey sentence was made to run concurrent with the New York sentence, Mr. Baskerville could then return to New York to demonstrate that he was incarcerated in the Bergen County Jail when the New York homicide occurred and have his sentence overturned.  Because of the sentencing defect in New Jersey, and because of his inability to return to New York, Mr. Baskerville has been prejudiced in both states.

42. As of September 2015, although the Bergen County motion judge increased his jail credit to 1,693 days, that court declined to revisit the application for re-sentencing unless Mr. Baskerville had his New York conviction overturned. See Tr. September 28, 2015, at 1 to 8. This was unreasonable since New York had refused to accept Mr. Baskerville's documentary proofs regarding his New Jersey jail credits. Moreover, New Jersey had the original jurisdiction over the Mr. Baskerville and maintained that right up to the time he was returned to begin his twenty year sentence.

**MR. BASKERVILLE'S STATEMENT/SUPPRESSION HEARING**

43. Following the New York Murder and robbery, two New York City policemen investigating the shootings interviewed defendant Martin Baskerville, who was in custody, in Hackensack, New Jersey, on unrelated outstanding warrants. Mr. Baskerville denied any involvement, but explained that he had heard that two others from Hackensack had been arrested and had implicated him. Mr. Baskerville also told the police that he knew some of the details of the crime: that "one guy died and the other one lived," Tr. April 18, 1990, at 20,

and that 9 mm. shells had been found behind a nearby house.

44. When pressed to "bring out the truth," Id., Mr. Baskerville requested immunity. The officers replied that only the Manhattan District Attorney could grant immunity and that he would come to New Jersey only if he "know[s] what you intend to tell him." Tr. April 18, 1990, at 21.  Mr. Baskerville responded:

> Well, hypothetically speaking, suppose I could produce the nine millimeter handgun that fired those shells that were found in the back of Vanessa's house, suppose hypothetically I could produce a true account of what happened at the shooting in Manhattan. That's bullshit about the car being rented to go over there, and if I were involved, one man wouldn't be dead and the other alive.  I would have turned over the second guy and shot him in the back of the head.
>
> Question: [W]ell, should we call the Manhattan District Attorney?
>
> Answer: I can give you the homerun [sic] in this case. But, I want complete immunity in New York and New Jersey. You contact the New York District Attorney and have him contact my lawyer and we'll work out a deal.

Id. at 21-22.

45. Defense counsel moved to suppress this statement. At the ensuing Huntley hearing, the prosecution presented only one of the two officers who conducted the interview. He was aware that Mr. Baskerville was in custody on a New Jersey warrant issued in a domestic violence case, but admitted that neither he nor his partner made any effort to determine if Mr. Baskerville had an attorney. Although the court believed that "[h]aving knowledge of the warrant [the police] knew that these were open cases and presumptively [Mr. Baskerville] had counsel," Id. at 38, the court found it "far from clear... whether the

14

Rogers/Bartolomeo line of cases has application here," Id.

46. When the court offered the parties the opportunity to brief the issue, defense counsel noted that People v. Bing, 146 A.D.2d 178, 540 N.Y.S.2d 247 (2d Dept. 1989) (mem.), was pending in the Court of Appeals. The prosecutor agreed that Bing was highly relevant to whether Mr. Baskerville's right to counsel had been violated, stating that it was "one of the primary cases the People are relying on in their opposition." Id at 38-40.

47. Realizing that Bing might prove dispositive, the court adjourned the hearing "on consent" for one month to see "whether there has been a decision in the Court of Appeals." Id. at 41. The hearing continued to be adjourned while Bing awaited decision.

48. On July 2, 1990, the Court of Appeals issued its opinion, which radically altered the legal landscape of the right to counsel by overruling People v . Bartolomeo, 53 N.Y.2d 225, 440 N.Y.S.2d 894 (1981). Bartolomeo had precluded questioning of a suspect whom the police knew had counsel on a prior, unrelated charge and had required the police to determine whether a suspect whom they knew had an open case was represented by counsel. Id. at 231, 440 N.Y.S.2d at 897.  If the police failed to inquire, they were chargeable with whatever knowledge such an inquiry would have disclosed. Id. at 231-32, 440 N.Y.S.2d at 894.  At the same time, the Court in Bing reaffirmed its holding in Rogers. People v. Bing, 76 N.Y.2d 331, 350, 559 N.Y.S.2d 474, 485. It explained that in Rogers the "right to counsel had been invoked on the charges on which defendant had been taken into custody and he and his counsel clearly asserted it." Id. (emphasis added).  In the quoted exchange, Mr.

Baskerville clearly referenced his "counsel" and the questioning was constitutionally defective.

49. As the record then stood at the <u>Huntley</u> hearing, Mr. Baskerville's case fell squarely within <u>Bartolomeo</u>. He was represented on prior charges (the New Jersey cases), of which the police were aware, and was interrogated on unrelated charges (the crimes that occurred on Amsterdam Avenue). Indeed, defense counsel was relying on a theory that was directly tied to <u>Bartolomeo</u>: that the police had a duty to inquire into whether Mr. Baskerville was represented on his New Jersey charges and not to question him without counsel if he was. <u>Bing</u> not only rejected this theory, but it did so on facts that bore an uncanny resemblance to this case. The defendant in <u>Bing</u>, like Mr. Baskerville, was arrested on an out-of-state warrant and then questioned about a New York crime. After <u>Bing</u>, Mr. Baskerville had no possibility of prevailing at the hearing unless he could show that he had actually informed the police that he was represented by counsel. The hearing resumed on July 23, three full weeks after <u>Bing</u> was decided.

50. After calling one more witnesses on a collateral matter, the prosecution rested the New York homicide case. The court, observing that all parties were aware that the Court of Appeals had overruled <u>Bartolomeo</u> and reaffirmed <u>Rogers</u>, tendered its "guidance to counsel and to Mr. Baskerville in terms of what the evidence shows at this point." Tr. April 18, 1990, at 18. The court stated that it would assume that Mr. Baskerville had counsel on the New Jersey case and that the record showed that the police "made no great inquiry to find

out precisely the nature of Mr. Baskerville's custody or of Mr. Baskerville's representation by anybody." Id. at 19.

51. Although the court first tentatively mused that the case looked like Rogers -- presumably because Mr. Baskerville was represented on the charges on which he had been brought in on the warrants, it failed to reach any firm conclusions.   Immediately after summarizing the evidence, the court observed that "[w]hat the legal effect of all of this is will have to [a]wait another day and a good deal of research." Id. The court then offered counsel the chance to put Mr. Baskerville on the stand, with the reminder that it was assuming that he had counsel on both the domestic violence case and all the New Jersey cases.  Based on this assumption -- which was legally irrelevant after Bing -- counsel decided that Mr. Baskerville's testimony would not be offered.

> **[DEFENSE COUNSEL]**: Therefore, in view of [Y]our Honor's assumptions, I've advised Mr. Baskerville not to testify.
>
> **THE COURT**: If he has testimony he wants to offer beyond that fact, that's fine.
>
> **[DEFENSE COUNSEL]**: No. That's the thrust of it. In view of that fact, I've suggested, urged him not to testify at this hearing.

Id. at 20.

52. After the parties discussed a briefing schedule, Mr. Baskerville protested that "from the beginning when the police questioned me, I told them that I had a lawyer. They [knew] in fact that I had a lawyer. They violated everything about this case." Id. at 22. In an ensuing colloquy, to the court the court, Mr. Baskerville made unmistakable his position that

17

he had asked for a lawyer:

> THE COURT: I have no testimony, Mr. Baskerville, that you asked the police for a lawyer. If there's something you want to say in that fashion, you should take the stand and say it because right now there's no testimony that you asked, that you said anything like that to the police.
>
> THE DEFENDANT: That's why I want to get on the stand.

Id. at 22-23 (emphasis added). Mr. Baskerville's testimony, which he had repeatedly brought to his counsel's attention, offered the only hope of prevailing on the suppression motion. Counsel nevertheless persisted in the belief that the court's assumption that Mr. Baskerville was represented on the other New Jersey cases sufficed. Ignoring his client's proffered testimony, counsel simply stated that "in view of your Honor's statement of facts and your assumption with respect to the representation of Mr. Baskerville, I rest," Id. at 23.

53. Not surprisingly, the court denied the suppression motion. After observing that, as in Rogers, Mr. Baskerville had counsel on the charges on which he was taken into custody, the court noted that the same was true in Bing. It then concluded that "this case and Bing are nearly factually indistinguishable," see decision at 6, and that Bing required that Mr. Baskerville's motion to suppress be denied. Even at this point, defense counsel did not move to reopen the Huntley hearing to present Mr. Baskerville's testimony or even the testimony of the other officer who was present which could have proved that Mr. Baskerville had directly invoked his right to counsel.

## NEW YORK'S USE OF PERJURED TESTIMONY

54. At Trial Mr. Baskerville's statement became a critical piece of a shaky

circumstantial evidence case.  None of the other alleged participants in the crime testified. The prosecution instead relied heavily on the testimony of Charnell Bates, her mother, Brenda Bates, and Clifton McCloud.  Both of the Bateses were admittedly heavy-drug users at the time; and Brenda had a lengthy criminal record. Their testimony was also suspect in other respects. Each recounted being on Central Avenue in Hackensack at around 2:30 or 3:00 p.m. on April 4, 1989 with Mr. Baskerville, Damien Robinson ("Jerry"), his brother Kenneth ("Buddah"), and Darryl Blaine ("Bistro"), at which time the prosecution claimed the robbery was discussed. Tr. October 15, 1990, at 101 and 167.

55. But hospital records proved that Jerry was hospitalized until 3:00 that same day. Id. at 381. Charnell testified that although they were they were "all standing around" she "was mostly talking to Jerry," Id. at 105, and Mr. Baskerville "was talking to my mother." Id. at 108. She nevertheless maintained that Mr. Baskerville was "present" when Jerry told her that "they" were going to "do" a drug spot, Id. All Charnell could remember Mr. Baskerville saying, however, was that he was going to New York to get money -- he never said how he planned to do this -- and that he would stop by her hotel room at 9:00 p.m. to repay some money he had borrowed. Id. at 112.

56. Brenda Bates could not remember him saying anything other than that he would be at the hotel at 9:00 p.m. Id. When Mr. Baskerville supposedly arrived at the hotel at the appointed time, he dropped off some cocaine (which the prosecution claimed necessarily was the proceeds from the robbery in New York) and left within a few minutes.  He supposedly

returned two hours later so "high," Id. at 173, and "bugged out of his mind" that he "couldn't talk," Id. at 187.

57. Brenda Bates was unable to calm him down and sent her daughter to enlist others to help control him. Indeed, Mr. Baskerville was so heavily under the influence of cocaine that the trial court held, as a matter of law, that he was too intoxicated to have adopted a statement made in his presence hours later. See Id. at 269. It was while Mr. Baskerville was in this impaired condition that he allegedly made two statements linking him to the crimes at 1792 Amsterdam Avenue. Charnell Bates maintained that in a conversation she had with him in the bathroom of her hotel room he admitted robbing a drug spot with Bistro and Jerry. Id. at 127. She made this claim, however, only after repeatedly insisting that she did not recall this incident and that nothing would refresh her recollection. Tr. October 15, 1990, at 123-124.

58. On cross-examination, she conceded that she was not certain about this conversation. Id. at 155. And while she testified that the out-of-court statement used to refresh her recollection was true, Id. at 156, she also maintained that the police told her they might lock her up if she did not tell the truth, Id. at 139, and had "help[ed her] a little bit by telling [her] what the truth was" and "what happened." Id. at 140.

59. Brenda Bates testified that at the time of this supposed conversation Mr. Baskerville was "bugged out of his mind" and incapable of talking. Id. at 188. Brenda asserted that Mr. Baskerville later told her a similar story, which included the added detail

20

that somebody had been shot with a 9 mm gun. Id. at 173-74. Yet she never specified how long after Mr. Baskerville's complete incapacitation this discussion took place. She could only offer the jury her assurance that by this undefined time Mr. Baskerville was coherent, a claim that the trial court evidently rejected when it precluded evidence of an adoptive admission given later that evening because "the only other evidence is [Mr. Baskerville] was freaked out of his mind about that time." Id. at 269.

60. McCloud confirmed the Bates' claim that Mr. Baskerville possessed a large amount of cocaine shortly after the robbery in New York. Id. at 281. He also testified that Mr. Baskerville in a motel room with both the cocaine and two men -- Bistro and Jerry who supposedly planned the robbery on Central Avenue and later participated in it. See Id. at 279-81. And McCloud provided one of the few links to the apartment where the shooting occurred: he told the jury that he, Jerry, and Jerry's brother, Buddah, had previously bought cocaine at 1792 Amsterdam Avenue on the same floor where Mr. Garcia was dealing drugs. T. 283-85. Finally, McCloud swore that Bistro had shown him a gun within an hour of the shooting. See Id. at 282-83.

61. The principal physical evidence in the case were shells found behind the house of Vanessa Perry, an acquaintance of Mr. Baskerville's. These shells, which matched those recovered at 1792 Amsterdam Avenue, were never linked directly to Mr. Baskerville. Although Ms. Perry asserted that he frequently visited her house, so did the Robinson brothers and, to a somewhat lesser degree, Bistro. Tr. October 15, 1990, at 233-34. So too,

perhaps, did numerous other people. Ultimately, this evidence depended on the jury otherwise connecting Mr. Baskerville to the robbery, either through his statement or through the testimony of the other witnesses. The other piece of physical evidence -- blood-stained clothes found in a car owned by Jerry's mother -- was utterly worthless.

62. The prosecution's own expert established no more than that the blood type matched Manuel Garcia's, Id. at 392, and forty- five percent of the population, Id. at 391, 396, and that blood could have been on the clothing for months. Id. at 398-99. And although one robber wore black sweat clothes and the other white, Id. at 68, the blood was found only on blue clothing taken from the car and not on the black sweat clothes that were also recovered. Id. at 395-96

63. To shore up this tenuous case, the prosecutor repeatedly -- and without objection -- elicited testimony that the police had arrested the other alleged participants. This had no conceivable relevance and was all the more damning because the prosecutor tied it to the testimony of trial witnesses. He thus had a police witness relate how he arrested Jerry and Bistro immediately after talking, respectively, to Charnell Bates and Kenneth Robinson. Id. at 341. In his summation, defense counsel addressed little other than the Bateses' testimony. He touched only briefly on the blood-stained clothing, explaining that it could have been in the car for months. Tr. October 15, 1990, at 445.          54. He completely ignored the more compelling point that there was no evidence that the blood was Mr. Garcia's.

## NEW YORK'S UNDISCLOSED LENIENCY
## DEAL WITH CLIFTON McCLOUD

64. New York had a lenience deal in place with Clifton McCloud that was never disclosed to the defense.  The prosecutor never informed defense counsel either before or during Mr. Baskerville's trial that he made Clifton McCloud any promises for his testimony in the case, in which McCloud was a non-participant but who had his own criminal exposure and had everything to gain by giving false testimony.  It was not until after Mr. Baskerville was convicted, and the prosecutor was confronted with Mr. Baskerville's § 440.10 motion, that the prosecutor belatedly admitted that there had been a deal with McCloud.

65. Not knowing that fact, in an effort to discredit McCloud at trial, defense counsel asked McCloud whether he had any deals for his testimony. Defense counsel presumably asked this because the prosecutor had informed him that one of the witnesses who testified in the Grand Jury was informed that the prosecutor in New Jersey, where the witness had criminal cases pending, would be informed that the witness had cooperated in our investigation." McCloud gave perjured testimony and the prosecution knew this fact.

66. Defense counsel first asked McCloud whether he was "promised anything by the district attorney for coming here and testifying." Tr. October 15, 1990, at 285.  McCloud pointedly denied any promise. Id. at 285. Just to be sure that there were no deals, counsel asked McCloud -- in words that were virtually identical to those the prosecutor used in his motion papers in describing the deal with an unnamed witness -- whether he was "promised that [his] cooperation would be made known to the New Jersey authorities." Id. at 286.

23

McCloud again swore he had no deal. The prosecutor later admitted that McCloud was the unnamed witness; that is, that he had promised McCloud that his cooperation would be made known to the New Jersey prosecutor.

67. At trial, however, the prosecutor never told counsel which grand jury witness had the deal. Without this information, counsel could not have known whether the unnamed grand jury witness testified at trial or, if he or she did, which of the trial witnesses had struck a bargain with the prosecutor. Worse yet, the prosecutor made no effort to correct McCloud's perjury. Instead, he let the jury decide the case under the false impression that McCloud's testimony was given with no strings attached. Knowing that McCloud had lied about his interest, the prosecutor then urged the jury that in evaluating credibility it should consider whether a witness "would have a reason to come in here to court and testify falsely." Tr. October 15, 1990, at 462.

68. Just five days after the court sentenced Mr. Baskerville, the prosecutor wrote the parole board of the prison where Mr. McCloud was incarcerated. A letter written by Thomas A. Wornom, the Assistant District Attorney who prosecuted Mr. Baskerville, is annexed hereto as Exhibit T. His stated purpose was "to inform you of the extent of Clifton McCloud's cooperation in a homicide case recently prosecuted by this office." The prosecutor recited how McCloud had given "very helpful" testimony before the grand jury. Id. After noting that McCloud was understandably reluctant to appear at trial against his "former friend," the prosecutor concluded that the testimony "was of some assistance to the successful

24

prosecution of this case." Id.  The prosecutor ended his leniency letter by requesting that the

parole board "take Mr. McCloud's cooperation in these cases [sic] into consideration when

he is being evaluated."

69. When confronted with the smoking gun, the prosecutor admitted that he wrote to

the New Jersey parole authorities on McCloud's behalf within a week after Mr. Baskerville

was sentenced. He maintained, though, that he wrote the letter only as a kindness to

McCloud.  Although he believed that McCloud's recollection at trial was less favorable than

it had been earlier, he swore that for some unexplained reason he decided to help McCloud.

The People thus claimed that they had no additional undisclosed deal with McCloud.

70. On February 25th, 2013, Darryl Blaine signed an affidavit admitting that he saw

Mr. Baskerville in Bergen County jail in February of 1989. Mr. Blaine also admitted in his

affidavit that the statements he made against Mr. Baskerville were not true. Exhibit U.

WHEREFORE, I respectfully request that the relief specified herein and in the

accompanying Notice of Motion be granted.

Dated: August 30, 2018

_____

Michael S. Kimm
Andrey Demidov
KIMM LAW FIRM
Attorneys for Defendant
333 Sylvan Avenue, Suite 106
Englewood Cliffs, NJ 07632
917-477-8500
Attorneys for Martin Luther Baskerville